UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:16 CR 95 CDP (JMB) |
| | ) | |
| GEORGE FREDERICK MUSSMANN, III, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant George Frederick Mussmann's motion to suppress evidence and statements.  (ECF No. 24)[1]  The government filed an opposition to Defendant's Motion to Suppress.  (ECF No. 25)  Pretrial matters, including any motions to suppress evidence, have been referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b).

**BACKGROUND**

In his motion to suppress as initially filed, Mussmann argued that the police took evidence and statements from him in violation of his rights under the Fourth and Fifth Amendments in connection with the execution of a search warrant at Mussmann's residence. More specifically, Mussmann alleged that, during the search, officers physically restrained him and conducted a strip and body cavity search of him without lawful authority to do so. According to Mussmann, any statements he made thereafter, and any drugs or firearms seized

---

[1] As explained in greater detail below, at the evidentiary hearing in this matter, Mussmann made an oral motion to suppress additional statements that were not contemplated by his original, written motion to suppress.  This Report and Recommendation addresses all of Mussmann's suppression motions.

during the search, must therefore be suppressed.

The government, on the other hand, argues that the officers obtained a valid warrant to search the premises as well as Mussmann's person. The government further contends that the police did not conduct a physically intrusive search. According to the government, the police conducted a search of Mussmann's person pursuant to a lawfully issued search warrant and incident to Mussmann's arrest. During that search, the police seized a cellophane bag of suspected narcotics that was stored Mussmann's underwear. Regarding Mussmann's statements, the government contends that Mussmann twice waived his Miranda rights, and twice made voluntary statements. Finally, the government identified four statements that Mussmann made at a later date which were spontaneous, and not in response to any form of interrogation.

On May 20, 2016, the undersigned held an evidentiary hearing on Mussmann's Motion to Suppress. Mussmann was present and represented by Assistant Federal Public Defender Felicia Jones. The government was represented by Assistant United States Attorney Toni Decker. At the hearing, the government presented the testimony of St. Louis Metropolitan Police Detective Lawrence O'Toole, and ATF Special Agent Casey Cook. Generally speaking, Det. O'Toole testified as to the events associated with the execution of the search warrant at Mussmann's residence, the search of Mussmann's person, and statements Mussmann made on the date of the search warrant. Special Agent Cook testified regarding the circumstances surrounding four statements Mussmann made after he was arrested in connection with the Indictment in this matter. The statements to SA Cooke were not included in Mussmann's initial motion to suppress. Mussmann made an oral motion to suppress these latter statements during the evidentiary hearing.

Defense counsel cross-examined both government witnesses extensively.

The Court received three exhibits in connection with the evidentiary hearing.

Government's Exhibit A was a copy of a Warning and Waiver Form, purportedly signed by Mussmann, which included a brief written statement. Government's Exhibit B was a copy of the application, search warrant, and return for 4025 Oregon Avenue, 2nd Floor, St. Louis, Missouri (Mussmann's residence). Defendant's Exhibit A was a photograph of Mussmann reportedly in the Oregon Avenue residence during the execution of the search warrant.

Both parties submitted post-hearing memoranda. In his post-hearing memorandum (ECF No. 32), Mussmann contends that the evidence supports a conclusion that the police subjected him to an unlawful, extraordinary, and intrusive body search. Additionally, Mussmann contends that statements taken from him on February 5, 2016, were not voluntary because "[n]o steps were taken [to] insure that he was not suffering from the extreme physical effects of drug use and withdrawal." (ECF No. 32 at 3)

In its post-hearing memorandum, the government (ECF No. 35) argues: (1) there was no unlawful search of Mussmann's person; (2) all physical items were seized lawfully pursuant to a search warrant and/or a search incident to Mussmann's arrest; (3) all statements made on February 5, 2016, were made after Mussmann waived his Miranda rights; and (4) all statements made after being arrested in March 2016 were spontaneous and voluntary, and not in response to police questioning.

Based on the testimony and evidence adduced at the May 20, 2016, evidentiary hearing, and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses during that hearing,[2] and having fully considered the parties' pleadings, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

---

[2] The undersigned observed the demeanor of the testifying witnesses and credits their testimony in making the findings of fact and conclusions of law herein.

**FINDINGS OF FACT**

1.      On February 2, 2016, in the Circuit Court for the City of St. Louis, Det. Lawrence

O'Toole, St. Louis Metropolitan Police, applied for and obtained a warrant authorizing the

search of the following:

> 4025 Oregon Avenue, 2nd floor, which is a two story, two family flat.  George
> Mussmann III, W/M, [DOB and SSN Redacted] and Jaime Johnson, W/F, [DOB
> and SSN Redacted].   The residence is located in the 4000 block of Oregon
> Avenue in the Dutchtown neighborhood.  The 4000 block of Oregon is bordered
> by Gasconade Street and Osage Street.

(Gov't Exh. B)  The warrant was issued on the basis of probable cause that heroin, illegal

firearms, drug transaction records, currency, and drug paraphernalia, among other items, would

be found during the search.

2.      The search warrant specifically authorized the search of the "premises and

person" described above.

3.      Defendant has not alleged any deficiency regarding the probable cause to support

the issuance of the warrant, or any other defect regarding the warrant, nor has the undersigned

identified any reason to doubt that the validity of the warrant.

4.      Det. O'Toole and a team of other law enforcement personnel executed the warrant

at approximately 10:45 a.m., on February 5, 2016.  A SWAT team breached the door and made

the initial entry into the premises searched.  The SWAT team conducted a clearing sweep of the

interior of the premises and detained four individuals found therein.  The four individuals were

restrained using plastic handcuffs to secure their hands behind their backs, and they were moved

outside until officers concluded that it was safe to return inside.

5.      Mussmann, the defendant herein, was one of the four individuals located in the

premises and detained during the search.  Jamie Johnson, who was also named in the search

warrant, was not present.  The other three individuals' identities have not been identified, but all

were adults.

6.      After officers secured the premises, but before any search was conducted, Det. O'Toole returned Mussmann to the residence and allowed him to sit down.  Mussmann remained restrained with the plastic handcuffs.  Mussmann complained of being cold and was given a blanket.

7.      Det. O'Toole verbally advised Mussmann of the basis of the search warrant and read Mussmann his <u>Miranda</u> rights.  Det. O'Toole advised Mussmann that the officers were investigating heroin and gun crimes.  Mussmann stated that he understood his rights.

8.      After he advised Mussmann of his rights, Det. O'Toole asked Mussmann if there was any heroin or guns in the residence.  In response, Mussmann told Det. O'Toole that there was heroin on a nightstand next to a bed, and guns under a floorboard in the closet.

9.      The officers located a small amount of heroin next to the bed as suggested.  At that point, Det. O'Toole arrested Mussmann.  Thereafter, Detective Ron Vaughn conducted a pat down search of Mussmann's person.  Det. O'Toole observed this search of Mussmann's person. Det. Vaughn was looking for items such as a concealed weapon.  At the time of the search, Mussmann was wearing sweatpants.

10.      During the search incident to Mussmann's arrest, Det. Vaughn felt an object in the back of Mussmann's pants.  Det. Vaughn pulled the pants back to locate the object and observed that the object was inside Mussmann's underwear.  Det. Vaughn did not pull down Mussmann's pants or underwear.  Det. O'Toole observed Det. Vaughn pull back Mussmann's underwear at which time Det. O'Toole observed a large clear cellophane bag that appeared to contain narcotics.

11.      The clear cellophane bag was between Mussmann's buttocks and underwear; the bag was not secreted inside of any part of Mussmann's body.  Det. Vaughn, who was wearing

protective gloves throughout, removed the cellophane bag.  No force was required to remove the bag from Mussmann's underwear.  There was no struggle between Mussmann and any officer present.

12.     There was no strip search, no body cavity search, and no utensils or tools were required to extract the cellophane bag from Mussmann's underwear.  There is no evidence indicating that Mussmann's buttocks or genitals were ever exposed to anyone other than the police officers conducting the search of his person.

13.     After the search incident to arrest, the officers resumed searching the premises. The officers located two loaded firearms under the closet floorboards – a Ruger .380 semi-automatic pistol, and a Smith & Wesson .357 pistol.  In addition to the suspected narcotics previously discussed, officers also found a digital scale with residue consistent with narcotics, sandwich bags, and personal papers addressed to Mussmann.

14.     After completing the search of the residence, Det. O'Toole transported Mussmann to the St. Louis Justice Center for booking.  At the Justice Center, Det. O'Toole presented Mussmann with a warning and waiver form that included a place for an arrestee to make a written statement.

15.     The warning and waiver form included a brief description of the alleged criminal conduct – in this case unlawful possession of a firearm and violation of Missouri controlled substance laws.  Part I of the form included written Miranda warnings.  Mussmann initialed the description of his alleged conduct.  Mussmann specifically acknowledged that he had been informed of his rights and initialed next to each right, indicating that he also understood his rights.[3]    Mussmann and Det. O'Toole each signed below the waiver and acknowledgement of

_____

[3] Each Miranda right was listed on a separate line.  Mussmann indicated he understood each right.  For example, Mussmann initialed next to the line stating "I understand I have the

6

rights.  (Gov't Exh. A)

16.     Part II of the form included a space for a written statement.  Mussmann's brief

written statement on the form reads as follows:

> I had a 357 S.W. [and] a ruger LCP 380[;] I bought both of them off the street[.]  I
> had approximately 4, 5 grams of heroin bagged up this was mine at 4025 Oregon
> Ave 2nd FL[.]  Jaime is not involved it is all me.

(Id.)  Mussmann initialed below the handwritten statement.  (Gov't Exh. A)

17.     At the bottom of the form, Mussmann attested, among other things, that he

understood the statement, the statement is true, and that he "made the statement freely without

hope of reward or benefit, without threat of punishment, and without coercion, unlawful

influence, or unlawful inducement."  (Gov't Exh. A)  Mussmann signed the warning and waiver

form at the bottom.  (Id.)

18.     Det. O'Toole did not immediately seek a warrant for Mussmann.  Instead, Det.

O'Toole released Mussmann, pending application of a warrant ("PAW").  During the course of

events on February 5th, Mussmann had complained about pain in his leg.  At the evidentiary

hearing, Det. O'Toole explained that Mussmann had a sore on his leg that Det. O'Toole

suspected might be a staph infection due to the Mussmann's lifestyle and the condition of

Mussmann's residence.  Mussmann told Det. O'Toole that he had seen a doctor and that he

needed to return for medical attention.  Det. O'Toole released Mussmann PAW so that

Mussmann could seek medical attention.  Det. O'Toole did not make any medical arrangements

on Mussmann's behalf.

19.     There was no testimony at the hearing indicating that Mussmann was in such

physical distress that his statements on February 5, 2016, were other than voluntary.  Mussmann

was twice given <u>Miranda</u> warnings, twice acknowledged those warnings, and twice made

right to remain silent."  (Gov't Exh. A.)

statements.  Det. O'Toole testified that Mussmann did not appear to be intoxicated.

20.     On March 2, 2016, a Grand Jury in this District returned an Indictment charging Mussmann with possession with intent to distribute heroin (Count One), possession of a firearm in furtherance of a drug trafficking crime (Count Two), and being a felon in possession of a firearm (Count Three).  (ECF No. 1)

21.     On March 16, 2016, the St. Louis Police conducted a traffic stop of Mussmann and thereafter arrested him on the Indictment.  The police took Mussmann to the St. Louis Justice Center.

22.     On March 17, 2016, Special Agent Casey Cook, ATF, transported Mussmann from the Justice Center to the United States Marshals Service ("USMS") office in the Eastern District of Missouri.  SA Cook and Mussmann arrived at the USMS in the morning of March 17th.  Mussmann complained that he abused prescription pills, and alleged that the last time he quit using drugs, he fell into a coma for several days.  Accordingly, the USMS required SA Cook to take Mussmann to Barnes Jewish Hospital for a fit-for-confinement evaluation.

23.     SA Cook transported Mussmann to Barnes Jewish Hospital for a fit-for-confinement evaluation, which required several hours to complete.  Due to the time it took to verify that Mussmann was, in fact, fit-for-confinement, SA Cook was not able to timely return Mussmann to the USMS office on March 17, 2016.  Instead, SA Cook transported Mussmann to the jail in Jennings, Missouri, to be held until March 18, 2016.  As Mussmann was being escorted out of the hospital for transport to Jennings, Mussmann stated, in substance, that he should have taken a security guard's weapon.  Mussmann also told SA Cook that he wanted some cigarettes and that he (Mussmann) had $20.00 he could use to buy cigarettes.  Although Mussmann was in custody at the time, neither of these statements was made in response to questions or comments from SA Cook or any other law enforcement personnel.

24.     After Mussmann represented that he had $20.00, SA Cook decided he needed to conduct a search of Mussmann and his property.  During that search, SA Cook located $20.00 and a razor blade in between the sole and insole of Mussmann's shoe.  SA Cook confiscated these items.

25.     While in transit from the hospital to Jennings, Mussmann stated that he should shout a racial slur out of the car window to cause a disturbance so that the car would be shot. This statement was not made in response to any questions or comments from SA Cook or any other law enforcement personnel.

26      Once at Jennings, Mussmann stated that he should have used the razor blade in his shoe to cut SA Cook.  This statement was not made in response to any questions or comments from SA Cook or any other law enforcement personnel.

27.     On March 18, 2016, SA Cook picked up Mussmann from Jennings and transported him to the USMS office in the Eastern District of Missouri.  While Mussmann was in the booking process at the USMS, Mussmann stated that he had a gun (a Beretta) in his car that was not discovered when he was arrested during the traffic stop, and that he would have used the gun when he was pulled over had he known there was a warrant for his arrest.  This statement was not made in response to any questions or comments from SA Cook or any other law enforcement personnel.

28.     SA Cook described Mussmann as talkative.

29.     Despite Mussmann's statements, at no time did he actually assault or attempt to assault or harm any of the law enforcement personnel involved in this matter.

**DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS**

Mussmann requests the Court to: (1) suppress all physical evidence seized from his person and residence on February 5, 2016; (2) suppress all statements he made to law enforcement on February 5, 2016; and (3) suppress all statements he made to law enforcement on March 17-18, 2016.

Regarding physical evidence, Mussmann contends that he was subjected to an unlawful and unreasonable body search on February 5, 2016. As a result, Mussmann asks the Court to suppress all evidence seized from his residence and/or his person on February 5, 2016.

Regarding his statements, Mussmann raises several distinct issues. In his motion to suppress, as initially filed, Mussmann argues that the statements he made on February 5, 2016, must be suppressed because those statements "were elicited as a result of an illegal, coercive search." In his post-hearing memorandum, Mussmann adds an argument that his February 5th statements should also be suppressed because he was suffering from the effects of drug use and withdrawal. As for his statements on March 17-18, 2016, Mussmann suggests that those statements should be suppressed because he made those statements in response to custodial interrogation, but was never given any <u>Miranda</u> warnings.

The record is sufficiently developed to permit a determination as to the admissibility of all identified evidence and statements.

**I.   Motion to Suppress Evidence Seized from Mussmann's Person and Residence on February 5, 2016**

Mussmann's motion to suppress physical evidence rests on his contention that police officers subjected him an unlawful search of his person during the search of his residence on February 5, 2016. The undersigned concludes that no unlawful search of Mussmann's person or residence occurred. Accordingly, Mussmann's motion to suppress physical evidence seized

from his person and residence should be denied.[4]

"The Fourth Amendment prohibits 'unreasonable' searches. 'The test of reasonableness … requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" United States v. Williams, 477 F.3d 974, 975 (8th Cir. 2007) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)). "In determining reasonableness, '[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" Id. (quoting Bell, 441 U.S. at 559). These principles also apply to searches of individuals. See Schmerber v. California, 384 U.S. 757, 767 (1966).

In his Motion to Suppress, Mussmann contends that, during the search of his residence, the police violated the Fourth Amendment by subjecting him "to a physically intrusive body search." (ECF No. 24 at 2) Mussmann specifically contends that "he was physically restrained, strip search[ed] and body cavity searched in front of multiple law enforcement officers and at least one other civilian who was a female." (Id.) According to Mussmann, although the police had a search warrant, "they exceeded the scope of the search warrant by invading [his] body." (Id.)

The factual premise underlying Mussmann's motion to suppress does not stand up in view of the evidence and testimony adduced at the evidentiary hearing in this matter. The record from the evidentiary hearing established that the officers never physically invaded Mussmann's body. Rather, in this case, the police conducted a "reach-in search" of Mussmann's underwear as part of a pat down search.

The first issue, therefore, is whether the police were justified in conducting the pat down search of Mussmann's person that resulted in the reach-in search. They were. Prior to entering

---

[4] Mussmann does not contest the validity of the February 2, 2016, search warrant.

Mussmann's residence, the police obtained a valid warrant that specifically authorized the search of Mussmann's residence and his person. (Gov't Exh. B) Thus, the police would have been justified in conducting a pat down search of Mussmann upon entering the residence to execute the search warrant. In this case, however, the police did not physically search Mussmann until after they found narcotics and decided to arrest him. Hence, there was no need for a warrant to conduct the pat down because the police could lawfully search Mussmann's person incident to his arrest.

A police officer may search a person incident to a valid custodial arrest of that person. See United States v. Robinson, 414 U.S. 218, 235 (1973). "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." Id. "It is the fact of the lawful arrest which establishes the authority to search." Id. (explaining that "[t]he authority to search the person incident to a lawful custodial arrest … does not depend on what a court may later decide was the probability that weapons or evidence would in fact be found upon the person of the suspect"). See also Virginia v. Moore, 553 U.S. 164, 177-78 (2008) (discussing Robinson); United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004) ("A search incident to arrest is justified by the concern for officer safety and the need to collect evidence ... [b]ut the presence of either justification need not be established in a particular case.") (citation omitted).

Moreover, during the search of a suspect incident to arrest, if it is immediately apparent to the officer that an item felt is a weapon, contraband, or evidence of a crime, the officer may seize the evidence from the person or the container. This is called the "plain touch" or "plain feel" rule, and is closely related to the "plain view" doctrine. See Minnesota v. Dickerson, 508 U.S. 366 (1993). Thus, "[a] police officer lawfully pat[ting] down a suspect's outer clothing may seize any object whose contour or mass makes its identity immediately apparent as

incriminating evidence." United States v. Cowen, 674 F.3d 947, 953 (8th Cir. 2012) (internal

quotations omitted) (citing Dickerson, 508 U.S. at 375; United States v. Bustos-Torres, 396 F.3d

935, 944 (8th Cir. 2005)).[5]

Based on the facts established during the evidentiary hearing, the undersigned concludes

that the police could lawfully conduct a pat down search of Mussmann.  First, the police were

acting pursuant to a search warrant that authorized the search of Mussmann's residence and

person.   Second, the police arrested Mussmann after lawfully discovering suspected narcotics in

his residence pursuant to a lawfully issued search warrant.  The police had previously developed

information indicating that Mussmann had been selling drugs from his residence.  Thus, there

was ample probable cause to arrest Mussmann.  See United States v. Rivera, 370 F.3d 730, 733

(8th Cir. 2004) (discussing probable cause to make an arrest).

Upon arresting Mussmann, the police were authorized to conduct a search of his person

incident to arrest.  Det. Vaughn conducted that search and felt an object in the rear of

Mussmann's sweatpants.  Given all of the facts and circumstances then existing, the

incriminating nature of the object would have been manifest.

The next question is whether the execution of the search—reaching in to obtain the

cellophane bag in Mussmann's underwear—"was reasonable in its scope, manner, and location."

Williams, 477 F.3d at 975.  The fact that the police conducted the search of Mussmann's person

pursuant to a lawfully issued warrant would normally negate any detailed inquiry into

reasonableness.  See Illinois v. Gates, 462 U.S. 213, 267 (1983) ("[S]searches pursuant to a

warrant will rarely require any deep inquiry into reasonableness."); see also United States v.

---

[5] In Cowen, the Eighth Circuit explained that the "immediately apparent" requirement is
not as strict as it may sound.  Rather, it merely means that, at that moment in time, the officer has
probable cause to associate the items with criminal activity.  See 674 F.3d at 953 (citations
omitted).

Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) (quoting same). In this regard, the Eighth Circuit's decision in Williams directs a conclusion that the reach-in search in this case was, in fact, reasonable.

Williams is remarkably similar to the present case. In Williams, the police "obtained a warrant to search Williams' home and person for drugs and firearms." 477 F.3d at 975. The police conducted a traffic stop of Williams and then a pat down search of his person. Id. The officers took Williams into custody and drove him several blocks to a precinct building in a residential area. Id. The officers removed Williams from the car within a partially exposed parking lot. Id. While in the parking lot, an officer "who was wearing a latex glove, opened Williams's pants, reached inside Williams's underwear, and retrieved a large amount of crack and powder cocaine near Williams's genitals." Id. The officers then took Williams inside and interviewed him after administering Miranda warnings. Id.

The district court suppressed the cocaine and Williams's statements to police, but the Eighth Circuit reversed. The Court began its analysis by noting that

> [t]here is no question that the police were justified in searching inside Williams's pants. The police possessed a warrant authorizing them to search his person for drugs and firearms, and an initial pat-down produced specific probable cause that Williams was hiding something inside his pants. The issue before us is whether the search was reasonable in its scope, manner, and location.

Id.

The Eighth Circuit rejected a claim that the search "was unreasonably intrusive in its scope and manner because it involved physical contact with [the suspect's] genitals." Id. at 976. "Some physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove drugs the suspect has chosen to hide there." Id. (citing cases). The Court also rejected an argument that precluded the police from any physical contact in order to retrieve the item stowed in a suspect's pants. Id.

The Eighth Circuit likewise rejected an argument that there may have existed less intrusive means to conduct the search. "'A creative judge, engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objective of the police might have been accomplished.'" Williams, 477 F.3d at 976 (quoting United States v. Sharpe, 470 U.S. 675, 686-87 (1985)). "But the existence of 'less intrusive means' does not, by itself, make a search unreasonable." Id. (citing Sharpe, 470 U.S. at 687; Illinois v. Lafayette, 462 U.S. 640, 647-48; Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

The Eighth Circuit further explained that, even though the suspect was in custody, the potential for the destruction of evidence was not completely eliminated. Id. "[I]t was not unreasonable for the officers to assume the initiative by seizing the contraband that Williams secreted in his underwear, rather than allow Williams to disrobe and remove the drugs himself." Id. The Court further opined that one could reasonably conclude that the reach-in search of the suspect's pants was less intrusive than a strip search. Id.

Having concluded that the scope and manner of the search in Williams was reasonable, the Eighth Circuit next tackled the question of whether "it was constitutionally unreasonable for the officers to conduct the search in an area that was open to public view, rather than inside the station house." Id. at 977. The Court concluded that it was not unreasonable. While the police should take measures to protect a suspect's privacy, "a reach-in search of a clothed suspect does not display a suspect's genitals to onlookers, and it may be permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy." Id. (citing United States v. Ashley, 37 F.3d 678, 682 (D.C. Cir. 1994); State v. Jenkins, 842 A.2d 1148, 1151 (Conn. 2004); State v. Smith, 464 S.E.2d 45, 46 (N.C. 1995)).

The Eighth Circuit concluded in Williams that the police took sufficient steps to protect the suspect's privacy. Although the search was conducted on a parking lot, it was "partially

secluded." Id.  "To the extent any citizen observed the search …, there [was] no evidence that such a person would have seen the private areas of Williams's body ….  Rather, the citizen would have observed … that an officer briefly reached inside Williams's pants and pulled out a bag of cocaine."  Id.

Mussmann's case is substantially indistinguishable from Williams.  As noted above, the police had a warrant to search Mussmann's person.  The police also had probable cause to arrest Mussmann, did arrest Mussmann, and therefore conducted a lawful pat down search incident to arrest.  Once the object was plainly felt in Mussmann's pants, the police had probable cause to seize the object.  The manner and the means of retrieval was no more intrusive than the manner and means approved in Williams – an officer wearing a glove briefly reached inside Mussmann's underwear to retrieve a cellophane bag of suspected narcotics.  In fact, the reach-in search in Mussmann's case was arguably less intrusive because there is no evidence that the officers made physical contact with Mussmann's buttocks or genitals at all.

The only meaningful factual distinction between the present case and Williams is Williams was searched in a partially exposed parking lot while Mussmann was searched in the privacy of his own home.  One cannot reasonably conclude that a parking lot is more private than a suspect's own residence.  In his Motion to Suppress, Mussmann contends that a female civilian was present during the search.  Even accepting this fact as true, there is no evidence that such person would have observed any private aspect of Mussmann's body.[6]  Mussmann's pants were not pulled down to retrieve the object.  Thus, like the situation in Williams, the citizen would have observed the police reach inside Mussmann's pants and retrieve a bag of suspected narcotics.  "[S]uch a search does not unreasonably infringe on [Mussmann's] privacy interests

---

[6] Although it may have been possible to move Mussmann to a more secluded location to complete the reach-in search, the possibility of less intrusive means does not necessarily render a search unreasonable.  Williams, 477 F.3d at 976.

when balanced against the legitimate needs of the police to seize contraband that he carried on his person." Williams, 477 F.3d at 977-78. See also United States v. Hambrick, 630 F.3d 742 (8th Cir. 2011) (upholding strip search as reasonable in scope, manner, and location where police had reliable information indicating that a suspect kept narcotics between his buttocks).

The physical evidence seized from Mussmann's residence and person was seized lawfully. The undersigned recommends that Mussmann's motion to suppress physical evidence be denied.

## II.    Motion to Suppress Statements

Mussmann also asks the Court to suppress statements he made to the police on February 5, 2016, and later on March 17 and 18, 2016. In his initial motion to suppress, Mussmann argued that the allegedly coercive and unconstitutional search of his person on February 5th rendered his Miranda waiver and subsequent statements involuntary. (ECF No. 24) In his post-hearing memorandum, Mussmann persisted in this theory, and also argued that his statements were not voluntary because he had complained of leg pain and the police did not take steps to "insure that he was not suffering from the extreme physical effects of drug use and withdrawal." (ECF No. 32)

At the evidentiary hearing, Mussmann also made an oral motion to suppress the statements he made to law enforcement on March 17 and 18, 2016. In his post-hearing memorandum, Mussmann contends that these latter statements were taken from him in violation of his rights under Miranda.

### A.    Relevant Legal Standards

Statements to law enforcement officers made during custodial interrogation are normally subject to the procedures set out in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Not every confession obtained

absent the Miranda warnings is inadmissible, however, because 'police officers are not required to administer Miranda warnings to everyone whom they question.'" Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Rather, Miranda warnings are required only when the suspect is in custody and subjected to interrogation. See id. When applicable, such warnings must be given before questioning begins. See Miranda, 384 U.S. at 444.

Because Miranda applies only to custodial interrogation, voluntary statements by a suspect which are not in response to questioning are not subject to Miranda. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citation and quotation omitted). Moreover, routine booking questions are reasonably related to police record-keeping and, therefore, are not related to the cautions of Miranda. Pennsylvania v. Muniz, 496 U.S. 582, 600-02 (1990); United States v. Reyes, 908 F.2d 281, 287-88 (8th Cir. 1990). See also United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994) (Miranda warnings not required for "[g]eneral on-the-scene" questioning).

If, after being given Miranda warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible at trial. Colorado v. Connelly, 479 U.S. 157, 169-70, 174 (1986); North Carolina v. Butler, 441 U.S. 369, 373-76 (1979); Miranda, 384 U.S. at 444, 475. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724. See also United States v. Mshihiri, 816 F.3d 997, 1004 (8th Cir. 2016) (quoting LeBrun); United States v. Perry, 714 F.3d 570, 574 (8th Cir. 2013) (quoting LeBrun).

"[I]t is not enough to show that the authorities' representations were the but-for cause of a confession." LeBrun, 363 F.3d at 724. "To determine whether a statement is voluntary [the

Court] examine[s] the totality of the circumstances, including the 'conduct of the officers and the characteristics of the accused.'" United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) (quoting LeBrun, 363 F.3d at 724). Furthermore, "[t]he Eighth Circuit has … stated that neither exhaustion nor intoxication will necessarily invalidate a Miranda waiver." United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998) (citing cases). Finally, the Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' …." Colorado v. Connelly, 479 U.S. 157, 167 (1986). See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002); United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994).

**B.     Statements Made on February 5, 2016**

Mussmann gave two statements to the police on February 5, 2016. There is no dispute that Mussmann gave both statements in response to custodial interrogation. There is also no dispute that the police advised Mussmann of his Miranda rights prior to questioning him. Thus, in order to be admissible, the government must show Mussmann's statements were made voluntarily, following a knowing waiver of Miranda rights.

Mussmann's initial argument that his waiver and statements on February 5, 2016, were involuntary rests on a claim that his statements were the byproduct of an allegedly illegal strip and body cavity search. In his post-hearing memorandum, Mussmann also argues that his statements were not voluntary because "[n]o steps were taken to insure that he was not suffering from the extreme physical effects of drug use and withdrawal." (ECF No. 32 at 3) The undersigned addresses both of these contentions below.

**1.     Did the Search of Mussmann's Person Render his Statements on February 5, 2016, Involuntary?**

Mussmann first contends that the police subjected him to a coercive search of his body,

and therefore his waiver and statements were involuntary. The facts established at the evidentiary hearing defeat Mussmann's fundamental premise—there was no coercive or intrusive body cavity search. Rather, the police conducted a reasonable and entirely lawful reach-in search to retrieve suspected drugs. To the extent Mussmann's motion to suppress statements rests on the impact of the reach-in search, it should be denied.

Furthermore, Mussmann made the statements at his house <u>before</u> the police conducted the reach-in search. Accordingly, his waiver and statements at the house could not have been influenced by the reach-in search, regardless of whether that search was coercive in nature.

The statements Mussmann made at the police station February 5, 2016, were made after the search of his person. Mussmann was given fresh <u>Miranda</u> warnings, initialed each warning, and gave a written statement that he attested was, in fact, true. Even if the reach-in search of Mussmann's underwear was coercive, which it was not, his waiver and written statement at the police station cannot reasonably be considered an involuntary byproduct of that search.

Having concluded that the lawful reach-in search did not render Mussmann's statements on February 5, 2016, involuntary, the undersigned will next consider the question of Mussmann's physical condition and status as a drug user.

> **2.     Did Mussmann's Physical Condition, Drug Use, and Withdrawal Render his Statements on February 5, 2016, Involuntary?**

Mussmann's argument that his waiver of rights and statements on February 5, 2016, were involuntary due to his physical condition cannot be sustained on the basis of the existing record and the undersigned's findings of fact. Having concluded that the police conducted a lawful and constitutionally reasonable reach-in search of Mussmann's underwear, the undersigned further concludes that such search cannot reasonably be construed as improper coercive police conduct. Although Mussmann's possible drug use and withdrawal and other physical ailments would

independently be relevant to his susceptibility to police coercion, there is no evidence at all to suggest that the police engaged in any coercive activity. The lack of coercive police conduct is detrimental to Mussmann's claim that his statements were the involuntary result of "the extreme physical effects of drug use and withdrawal." See Robinson, 20 F.3d at 322.

Apart from Mussmann's claim that the police conducted an invasive body search, which the undersigned's findings of fact do not support, the record indicates that the police conduct in this case was not at all coercive. It is not disputed that the police administered Miranda warnings each time they questioned Mussmann on February 5, 2016. See United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996) (explaining that a finding that Miranda "warnings were given weighs in favor of a voluntariness finding") (citation omitted). Mussmann indicated that he understood his rights and thereafter gave a statement. There is no argument or suggestion that Mussmann ever invoked his right to remain silent or requested counsel. See Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) (explaining that issue of voluntariness "tends to end with the finding of a valid waiver"); Dickerson v. United States, 530 U.S. 428, 444 (2000) (advising that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the [police] adhered to the dictates of Miranda are rare") (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

In addition to the fact that the police administered Miranda warnings and Mussmann acknowledged those warnings, Officer O'Toole testified that Mussmann did not appear intoxicated to him. The undersigned credits that testimony. See United States v. Contreras, 372 F.3d 974, 977, 978 (8th Cir. 2004) (confession found voluntary even though defendant recently used drugs because he appeared sober). See also United States v. Palmer, 203 F.3d 55, 60-61 (1st Cir. 2000) (confession held voluntary despite defendant's heroin withdrawal where defendant appeared clear-headed); United States v. Cristobal, 293 F.3d 134, 138-41 (4th Cir.

2002) (confession found voluntary despite questioning in hospital, while defendant was on pain medication following emergency surgery); United States v. Reynolds, 367 F.3d 294, 298-99 (5th Cir. 2004) (confession found voluntary despite lack of sleep and drug usage where the defendant was alert and cooperative and officers did not observe defendant to be under the influence of drugs).

Other facts and circumstances strongly indicate that Mussmann's waiver and statements were voluntary and not the product of police coercion. The police did not employ any deceptive practices. To the contrary, prior to questioning Mussmann, the police truthfully advised him of the nature of their investigation, and the questioning was brief and straight forward. Additionally, once at the police station, Mussmann provided written confirmation that he understood his rights. (Gov't Exh. A) Similarly, Mussmann provided a handwritten statement and represented that his statement was true and made "freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." (Id. emphasis supplied) Moreover, the record indicates that the police were reasonably attentive to Mussmann's physical needs. For example, the police also gave Mussmann a blanket when he complained of being cold, and released him so that he could have his leg sore addressed. Finally, the record as a whole suggests that Mussmann was a talkative person.

Mussmann's statements on February 5, 2016, were voluntarily made after he waived his rights pursuant to Miranda. Therefore, the undersigned recommends that the Court deny Mussmann's motion to suppress his statements from February 5, 2016.

### C.   Statements Made on March 17 and 18, 2016

Regarding his statements to SA Cooke on March 17 and 18, 2016, Mussmann does not contend that his statements were involuntary or coerced. Rather, Mussmann argues that: (1) he

was in custody when he made the statements on March 17th and 18th; and (2) he was not given his <u>Miranda</u> warnings nor given an opportunity to speak with a lawyer.

Mussmann was no doubt in custody on March 17th and 18th, and the government has offered no evidence suggesting that Mussmann had been given <u>Miranda</u> warnings by SA Cooke on either date.  The critical issue, therefore, is whether Mussmann's statements were made in response to police questioning.  As outlined in the undersigned's Findings of Fact above, each of Mussmann's statements on March 17th and 18th was spontaneous—no statement was made in response to any questioning or comments from law enforcement personnel.  Therefore, although Mussmann was in custody, he was not entitled to <u>Miranda</u> warnings because he was not subject to any law enforcement interrogation or questioning.  <u>See</u> <u>Innis</u>, 446 U.S. at 300-01; <u>see</u> <u>also</u> <u>Perkins</u>, 496 U.S. at 296.

Mussmann's motion to suppress the statements he made on March 17th and 18th should be denied.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence (ECF No. 24), as supplemented by counsel's oral motion and post-hearing memorandum, be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

The trial of this matter has been set for September 26, 2016, at 8:30 a.m., before the

Honorable Catherine D. Perry, United States District Judge.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  4th  day of  August , 2016.